## TOMMIE KNIGHT v. STATE.

No. A-9590.   Nov. 9, 1939.

(95 P. 2d 905.)

M. Bristow, Morton Perry, and Thad Klutts, all of Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen. for defendant in error.

DAVENPORT, J.   The defendant was by information charged with the crime of robbery; was convicted and sentenced to serve a term of 40 years in the penitentiary; from which sentence and judgment, the defendant appeals.

The testimony on behalf of the state shows that the defendant had been previously convicted and served a term in the penitentiary for larceny of an automobile.

Dr. Austin R. Stough, testifying on behalf of the state, stated that he saw W. P. Dorris in the Samaritan Hospital about 2 o'clock a. m.

"He was covered with blood, his head and face, and we cleaned him up. He had two or three cuts on his face, one large one on his lip, and one on his chin; and his eyes and nose were swollen, and his entire face was just black and blue; and he had two or three knots on his head, one small cut on the back part of the right side, and the inside of his mouth was cut pretty bad; his inside lip and his lower lip was torn from his gum, and his upper lip was torn from his gum; his nose was swollen quite a bit at the time. I thought it was possibly a break, but later I decided it was practically a dislocated cartilage from the bone; and his eyes were very bad cut and swollen, almost closed. I don't think there was any permanent damage to his eyes. His face was all swollen; and there were bruised spots over it, covering almost the entire area of his face, with some small skinned areas beside the cuts. I took about three sutures in the upper lip and about two in his chin; then I had to take several stitches inside his mouth to repair his lip. I have seen Mr. Dorris since I have been here to-day."

On cross-examination the witness stated:

"I saw him about 3 o'clock in the morning. I don't know how he got to the hospital. I think he had been there 20 or 30 minutes before I saw him. I couldn't detect any odor of liquor on him. I would not say there wasn't any. The bruises and cuts on his face and head were apparently inflicted with some blunt object. I believe it could have been done with a man's knuckles."

Louise Mashburn, testifying for the state, stated that she was 17 years of age and lived at 324 West Chickasha.

"On April 16th, or thereabouts, I was at the A & A Buffet. I went down there about 8 or 8:30 and left about 10:30. I went down there with Juanita Price. Prior to that time I was acquainted with Tommie Knight. When Juanita Price and I got to the A & A Buffet, we went in and started dancing. The A & A Buffet is at 409 West Reno. I did not know Dorris prior to that time. When I first saw him, he was seated down there in a booth. He asked Juanita and I what we wanted. Juanita and I were

dancing; and he called me and them over there. Juanita came back and got me; and all three went in and sat down by him. I don't know what time it was when Tommie Knight came in. He started talking to me. He did not sit down at that time. After Tommie had left, Bill asked if that was my boy friend; and I said he was. He said, 'Why don't you get them, and we will all go out to the Trocedero Night Club?' I don't know where it is located. I had never been out there before. We all went together out some place. Bill Dorris told me he had a car outside. He had taken two drinks at that time. I asked Tommie to go. He hesitated at first. He went with us from there. We went down in the 200 block on West Reno, and got a pint of whisky first. We went to a number of different places, out to the Atlas Buffet, the Oasis, Swing Time, and Happy Time. I don't remember our dancing anywhere except the Oasis. We all went down to a place where they have tourist cabins. I don't know where it was, myself. We went south, I think. It was out on the New Castle road. I don't know just when we got there; but I imagine it was after midnight. Those who went to the tourist cabin were Bill Dorris, Tommie, Juanita, and I. We were just in one tourist cabin. The car was parked out in front of the cabin we were in. It was Bill Dorris' car; and the same one we started out in. The car was right at the cabin. We went in the cabin; and Bill Dorris started to undress. He pulled out everything he had in his pockets, and laid them on the table. He was starting to take his coat off; and Tommie said, 'Look here, Bill.' And about that time he hit him. He just knocked him down on the floor. Bill tried to get up. Every time he would do that, Tommie would hit him again. I did not see him do anything but hit him with his fist. Juanita and I were standing in the corner; and Tommie just kept hitting Bill. Bill got up, and got on the bed; and Tommie hit him again. He kept on hitting him. Juanita went up and tried to get him to stop, and he hit her. I tried to get him to stop, and he hit me, and knocked me out. I fell in the floor; and Juanita picked me up. When I got up, I had a black eye; and my nose was skinned up about like that. I had a big skinned place on the side of my cheek. He just had his money in

his pocket. I did not see any billfold. He had $26 in money. That is all I saw. I don't know how much he had when we started out that evening. Every time he would go to do anything, he would pull all his money out of his pocket, and hold it in his hand."

At this time a number of bills were introduced, marked State's Exhibit "1."

The witness continued:

"He had the bills wadded up in his hand; and every time, when he started to do anything, he would just pull out what he wanted. As far as I remember, Bill Dorris paid all the bills that night. Juanita and I walked out of the door of the cabin first. Bill was still laying on the bed when we walked out. He was bleeding. There was blood on the floor. I don't know whether there was any blood on Tommie Knight or not. We had all three left in Bill Dorris' car, Tommie, Juanita, and myself. Bill was left in the cabin. Juanita said she saw him standing in the door. The last place I saw him was on the bed. Tommie drove Bill Dorris' car in which we left the cabin. I next saw the money when we got out at Brock Park. Brock Park is on Southwest 29th street. During the ride up towards Brock Park, we hit a big bump. I bounced up and hit the car on top, and then come back and hit on the windshield. We left the car right at the park. I saw the money at the park. I counted it out to Tommie. I counted out $26 in bills to Tommie. I found it laying on the ground there by the car. We got out of the car; and we walked up there; and Tommie asked us about the money. We didn't have it; and to prove it to him that I didn't have it, I said I would go back and look for it, and just as I was going back, I found it laying on the ground. It was laying just a little back from the left-hand front door. There was $26. I gave it to Tommie; and he took it. He didn't give either of us any part of it. We went out and sat down by some bushes; and Tommie said he was going to get a cab, and to just sit there until he came back. When he left, Juanita and I got up and said we were going home, and we did. We didn't report it to the police. Saturday night

after this occurred on Friday night, I was arrested. Juanita was with me when I was arrested. Tommie Knight, the defendant now on trial, is the Tommie Knight that was with us that night."

On cross-examination the witness stated:

"I am 17 years of age. My name is Louise Mashburn. The other girl's name is Juanita Price. We were at the A & A Dance Hall when we first met up with Bill Dorris. I had never seen Bill Dorris before. I did not know whether he was married or not. Dorris suggested that I come up and drink something. I drank a Dr. Pepper. It was between 9 and 10 o'clock. Tommie just stayed there a few minutes, and said he was going down to the cafe. That was when Bill Dorris asked me if Tommie was my boy friend. Dorris suggested that we go and get Tommie, and let Tommie be my date, and Juanita be his. There was another girl there; the other girl was Mary Castleberry. Bill Dorris paid for everything as far as I know. Later Dorris suggested we go and get some whisky. We did go and get some whisky. I drank some of it; and Juanita drank some of it. We got the whisky in the 200 block West Reno. We got a pint at that place on West Reno. All six of us drank that pint. About an hour after that, Bill Dorris suggested we get some more whisky. When we got to the Oasis, Tommie and I were dancing; and Dorris got another pint. He brought it in; but I didn't drink any of it. Mary Castleberry and Otis Brown drank some of it. Mary Castleberry is 15. I don't know how old Otis Brown is. After we drank this whisky, we went back to the A & A, and left Mary Castleberry and Otis Brown there. We left the A & A then, and went out to the cabins. On our way out to the cabins, Bill got very drunk. He was driving his automobile while drunk. I don't know where this tourist camp is. It is south of county line. I don't know how far southwest. It is the Davis Tourist Camp, and is on the New Castle road. I don't think we went through New Castle to get to these cabins. I don't know whether the money introduced in evidence here is the money that Bill Dorris had. I don't know whether he did anything to Juanita just before Tommie struck

him or not. I was pretty well intoxicated. We came back from the tourist camp and went east on 29th street. Tommie was going to take us girls back home, and he was then going to go back and get Bill. We started home, and something happened to the car. Tommie said he was going to get a cab, and said go on home."

On redirect examination the witness stated:

"Tommie didn't hit me any more after I found the money at the side of the car. I didn't take the money out of my pocket during that ride out there; nor did I take the money from the cabin. After the wreck happened, Tommie demanded the money; and I told him I didn't take it, and went back to the car, and there it was laying. I don't know where the county line is. The name of the tourist cabin where the fight was, was Davis."

Juanita Price testified for the state. Her testimony in substance is the same as Louise Mashburn testified as to where they met Dorris and the defendant Tommie Knight on the evening of the alleged robbery, and what took place up until the time that Tommie Knight beat up Dorris, then took the money of Dorris and his car, and drove away from the cabin leaving Dorris in the cabin.

Juanita Price stated that she was only 14 years of age. The testimony shows that when they were getting ready to leave the car of Dorris where they had partially wrecked it, that the defendant accused the girls of having the money, and one of them told him that to prove to him that they did not have it that she went to the car, and near the car on the outside of the left-hand door, they found the money and gave it to the defendant.

H. S. McDonald testified for the state in substance as follows:

"I am a member of the Oklahoma City Police Department. On the 16th of April, 1938, I received a call around

1 a. m. About 5 a. m. I arrested Tommie Knight at Sheaffer's beer joint at 130 West Reno. I took him immediately to the station."

The witness identified the shirt that was worn by Tommie Knight at the time of his arrest, and was taken off him at the police station. His testimony tended to show that the shirt was bloody.

The witness continued:

"Bills similar to the one you have handed me were taken off of Tommie Knight at the time he was examined in the detective bureau. We, also, took off him a pink receipt for $1 for a jacket he had purchased. Tommie Knight stated to us that he had bought the jacket at Sheaffer's, and gave the man a dollar for it."

On cross-examination the witness stated:

"It was about one a. m. when we made the arrest. I don't remember the exact date, but it must have been the 17th or the 16th."

Jean Wells, testifying for the state, stated that he was a member of the police force of Oklahoma City, and that he was with Mr. McDonald at the Sheaffer's beer parlor, 130 West Reno avenue, when Tommie Knight was arrested; that he was acquainted with Tommie Knight personally.

"The defendant in this case is the same man that was convicted September 6, 1932, for the larceny of a car, and given five years. When I arrested him he had $25.25 in money and a receipt for a jacket he had bought. The money you have handed to me is the same money we took off the defendant Tommie Knight. We never did find his billfold that night. The shirt exhibited to me is the shirt Tommie Knight was wearing the night we arrested him; and it was bloody at that time."

The receipt taken off Tommie Knight for $1 was introduced in evidence over the objections of the defendant.

The witness continued:

"This receipt was in his pocket at the time we arrested him. The $20 and the 25 cent piece shown me, we found on him at the time of his arrest. We went in a police car, but received information from a Mr. N. E. Lowery, a cab driver. He directed us where to go. We went to Brock Park on Southwest 29th street, and turned north on it. It is the first street east of Pennsylvania and north of Southwest 29th street. We noticed a car with dimmers on, and so we turned around and went back to Southwest 29th, and then about to Southwest 28th and Pennsylvania, and there found this 1936 Terraplane. Later I learned it was Mr. W. P. Dorris' car. When we found this car it was about 4:30 in the morning. When we found the car, the lights were on dim. The car was damaged so that it would not run."

N. E. Lowery was called as a witness. He testified that he drove a cab for the Capitol Hill Company; that he was on duty on the morning of April 16, 1938:

"I made a call about 3:58 in the morning. When I got to 29th and Kentucky, that boy sitting right over there was at that place at 29th and Kentucky. I didn't know him at that time. I have since learned his name is Tommie Knight. There was no one with him at that time. He got in the car; and I asked him where he wanted to go. He said to head it west. He said he had a couple of girls out there that were drunk, and he wanted to go and pick them up. He said for me to go to the first little short street this side of Pennsylvania on the east side of that park. I drove north about 75 yards, and he told me to stop and turn my lights out, and he would go and get the girls. I stopped and turned my lights out. He went out there around in the bushes, and I figured he had some one out there and needed help. He had two girls out there that were drunk, but he came back and said they were gone. This was on the east side of the park. I drove north about a block and a half. There is a blind street. It is not opened through. I turned there and went back to 29th, and then

west to Pennsylvania. As we were driving along through the park, we saw a parked car setting there with dim lights. I don't know what kind of a car it was. I didn't stop. I drove around there; and he asked me what it would cost him to go to Happy Time Night Club; and I told him. We were out there about five minutes. The place was closed up and dark. From there we went to Swing Time Night Club, which is on Southeast 29th. We were there about 15 or 20 minutes. He was talking quite a bit of the time. He made a remark two or three times, and said, 'Now you don't know nothing.' I told him, 'I don't know nothing.' In the meantime he told me he had been in the penitentiary, and said if anything has happened out in this end of town, they could lay it on me. He cautioned me if I happened to be stopped any place, not to tell where I got him or had taken him. We never did find the girls. I let him out in the one hundred block on California in front of the Logan Hotel. He gave me $2.50 for my driving."

Mr. Wahl testified that he was a member of the Highway Patrol, and received a call in the early morning of April 16, to go to the tourist camp on the road southwest of town:

"The tourist camp is in Oklahoma county. The section line there is the county line; and the tourist camp is on this side of the section line. I saw W. P. Dorris at the camp. He was in the office of the camp when I first got there. At that time I had not seen Tommie Knight or the girls. When we got to the tourist camp, W. P. Dorris was there. His eyes were practically swollen shut, and his nose, I believe, double the width it is at the present time. His face was terribly beaten up. He was bloody, and was terribly beaten up and in sort of a daze he had been beaten so bad. By Mr. Perry: We object to that. By the Court: Sustained."

The witness continued:

"I received a billfold at the Davis Tourist Camp. Mr. Dorris handed it to me. I later went to the police station,

and saw Tommie Knight there. He was under arrest when I got there."

The witness examined the shirt, marked state's exhibit 2, and identified it as the shirt Tommie Knight had on when he got to the police station.

Frank Gough was called as a witness for the state; and the defendant interposed an objection for the reason that the witness' name was not indorsed on the information; which objection was overruled by the court. The defendant excepted.

The witness stated that he was a member of the police department, in the bureau of records; that he fingerprinted Tommie Knight, and took his picture. "I took a picture of Mr. Dorris at his home. I took the picture on the 16th day of April."

Over the objections of the defendant the picture of Dorris was introduced in evidence.

W. P. Dorris testified that he lived at 1312 Northeast 17th street:

"I work for the Frisco Railroad, and have for about 20 years in November this year. I am a married man, and have a child by my first marriage. On April 16th or late in the evening of the 15th, I went down to the A & A Buffet. This cafe is on Reno. I met two girls. I have seen them here today. They testified as witnesses. Their names, I believe, are Juanita Price and Jewell Mashburn. Up to that evening I had never seen Tommie Knight. I met him that night. The girls called him over and introduced him to me. We went automobile riding that night. I could not tell the jury how many different places we went. The four of us went together and rode in my car, a Terraplane 1936. I don't know the number. The tag is 78—033. After we had been to the different night clubs, we started to the Davis Tourist Camp on Highway 277. This camp is in Oklahoma county. Tommie rented the cabins. I

paid for it. We went in the cabin; and the next thing Tommie hit me. Every time I would start to get up, he would hit me again, and then he must have knocked me out, because when I came to, they were gone; so I came over to the cabin office and told this man I had been beaten up. When we started out that evening, I had $40. When we got to the cabin, I had $26. When I came to myself, and came out of the cabin, I didn't have any money. I did not give any one permission to take my money; nor did I give Tommie Knight or any one else permission to take my car away from where it was parked. I immediately told the man in the cabin office to call the officers. In a short while they came. When the officers came, my head and face were beaten, my cuts were all bleeding, and I couldn't hardly see out of my eyes. I don't know what I was hit with. It must have been with his fist, because nobody else could hit me that hard besides Tommie. I felt like something awful hard hit me. I must have been kicked, because my face could not have been in the condition it was without being kicked. There were cuts in my upper lip inside and out, and my eyes were black. My nose was swollen twice its natural size. It was cut inside, and some stitches were taken. All of the bills and money I had was taken there that night. The next time I saw Tommie Knight was at the justice court."

The witness pointed out the defendant on trial as being the Tommie Knight that robbed him.

On cross-examination the witness stated that he was 35 years old, married, had a family, one child by a previous marriage: .

"I met these people at 7:30 or 8:30 in the evening. I first saw the two girls, and I got to talking to them. Later Tommie came along. I was introduced to him. I suggested that the four of us go riding. I didn't suggest that we go on Reno and get some whisky. We got the whisky. I don't recall who paid for it. I wouldn't say that I didn't pay for the whisky. After they got that liquor, I believe we went to some night club on 29th. It was known as a dance hall. I do not know how long we

stayed there. From that place we went on to some other place. We went to one, I believe, that was called the Happy Time. We were there probably an hour. From there we went to the cabins. I don't know of any second pint of whisky. If there was a second pint of whisky bought, I know nothing of it. I don't recall that I paid for a second pint or that there was a second pint. I wasn't drunk. I didn't commence pulling off my coat and lay my money on the table in the cabin. I must have had my money in the billfold or my pants pocket. It was not laying on the table. When I came to, I was laying on the bed. I don't know where I was when the two girls and the defendant Tommie Knight left. I was not standing at the door watching them. I did not have any money on the table. I don't know whose money was on the table, if any one's. After I came to my senses, I talked to the tourist cabin manager. Mr. Wahl, I believe that's his name, was the first officer I talked to. I didn't talk to Bill Eads. The defendant and the girls did not stop me in the road. I didn't tell anybody that these people stopped me in the road. The only statement I made was in the justice court. I did not testify, in the justice court that they stopped me in the road. I told them I met them in the A & A Night Club. I did not talk to Bill Eads about this."

On redirect examination the witness stated:

"I do not know how many times I was struck. I know it must have been several. I do not remember seeing the girls and the defendant leave the cabin. I do not remember the man who runs the cabin finding a billfold and giving it to me. I had a billfold. I went in the cabin with the money I described, and came out without it. If it was on the table or in my pocket, it was taken from me and without my consent."

The foregoing is the substance of the evidence for the state.

Murray Gibbons, called as a witness on behalf of the defendant, stated that he was an attorney, licensed to practice law in the state of Oklahoma, and maintained an

office in Oklahoma City. "I know Tommie Knight. I have known him for a little over a year. I think I first became acquainted with him in April or May last year."

The witness testified to having had some business with the defendant in the nature of collection of claims. He stated that the defendant got his money he collected for him sometime the latter part of March.

Juanita Price was called for cross-examination:

"My name is Juanita Price. I am the same Juanita Price who testified in this action before in this court. I knew I was charged here for participation in the crime that is alleged against the defendant in this case."

Louise Mashburn was recalled and cross-examined further, and admitted that she knew she was charged jointly with the defendant in this case.

When the state rested, the defendant demurred to the evidence of the state, and moved the court to instruct the jury to return a verdict of not guilty in this case. The demurrer was overruled; exceptions saved.

Bill Ketchum testified:

"My name is Bill Ketchum. I run the Happy Time Night Club. I saw the defendant at my place of business the night it is alleged that this robbery took place. It was about 10:30 or 11 o'clock. He bought some beer and paid for it. He had money."

On cross-examination the witness said he did not see any one with him.

"There was a bunch of girls there, but I don't know whether any of them were with him or not. I do not remember seeing this man that he beat up. He could have been there, but I did not pay any attention to him. The defendant drank some beer out at my club that night. The next time I saw him after that was at the preliminary.

I don't know when it happened. The only thing that I know is that the constable came out and asked me if I saw him out there. He drank two bottles of beer. There was quite a few customers, but I do not know how many. I have a place where I sell beer. He was standing against the bar when he was drinking his beer."

Selma Justice, called as a witness, stated:

"My name is Selma Justice. It is Justice, but it was O'Donald then. I work at the Toot-and-Tell'em Barbecue. That is at 1530 Southwest 29th street. It was on the 15th and 16th of April. I know the defendant. I saw him there on about the 15th of April, 1938. I don't remember just what time he came in. It was at night, in the latter part of the evening, somewhere around 7 or 8 o'clock, something like that. I think he bought a bottle of beer and two or three cokes, and maybe some gum. He made some purchases. Well, he had some money in his billfold. I saw some bills in his billfold. I don't know how many."

On cross-examination:

"My name was Selma O'Donald when this happened, when Tommie knew me at that time. I have known Tommie off and on, I guess, for the last five or six years. I didn't know him before he went to the penitentiary. They do not dance at my place. It is just a barbecue stand. I wouldn't know if some one came with Tommie to the barbecue stand or not. At the time Tommie was in there, it was a time when we were not very busy. I don't believe that I saw him after that evening until today. I think he drank two cokes there, and he bought the girls all a coke that were in there, Mary Ellen and Marie, and I think Edith one, and bought George something to drink."

Mary Ellen Clark testified in substance to the same facts as did Selma Justice.

George E. Reinert stated that his name was George E. Reinert and that he ran the Toot-and-Tell'em Barbecue Stand.

"The defendant was in my place the latter part of the week. I don't know exactly what day, but he was around there until about ten in the evening, and bought the girls some drinks, and bought me a coke. He paid for the drinks with a dollar bill. He had some more bills in his purse. I don't know the denominations."

Tommie Knight testified for himself:

"My name is Tommie Knight. I am the defendant in this case. I am 23 years of age. I have lived in Oklahoma City going on 16 years. I am a rig builder; worked at that close to three years. I first met up with the complaining witness at the A & A Cabaret. That is located on Reno. I know Louise Mashburn; have known her about five or six months. I have seen Juanita Price twice. About 8:30 in the evening, I judge, when I went into the cabaret, I walked in and they were sitting there drinking beer. I walked on past them, and Louise got up and came on up to talk to me, and they asked me to sit down. I told them, 'No,' that I had some business to attend to, and I left. I went up to the White-Way Cafe at 125 West Reno. I probably stayed there about thirty minutes, and came back down to the A & A. When I got back down to the A & A, I walked back to the back. They had been out somewhere else. I don't know where they had been; but they came back in, and wanted me to go with them riding. I told them, 'No,' I didn't care to go, and they insisted. I didn't tell them I was broke. I told them I didn't have any money to spend. Mr. Dorris said that was all right, they did not care, to come and go with them; and I went with them. We went to 211 West Reno to get a pint of whisky. Mr. Dorris bought it. The whole bunch drank it. We went from there to other places, and drank beer; then we went to the Happy Time. Dorris got the second pint of liquor, and paid for it. From there we went to the cabin at Mr. Dorris' suggestion. All of us went in the cabin. All of us were in the cabin, and Mr. Dorris walked in first; I was next; and the girls walked in behind us. Mr. Dorris pulled everything out of his pockets and laid them on the table. He had a bottle of whisky, and put that on the table; and me and Mr. Dorris had a drink of whisky.

He drank a couple of swallows more than I did. I didn't drink much. I drank last. He walked around behind me and took hold of Juanita Price. He took hold of her arm, and said, 'Come on,' and said something else to her, and said, 'Come on, I am going to get in your breeches,' and when he did that, I turned around and knocked him down. He tried to get up, and I hit him and knocked him down, and he tried to get up, and I knocked him down again. I reached down and got him under the arms right up under here (indicating) and started to set him on the bed; and when I did, he hit me over on the side of the chin, and grabbed me around the neck; and when I got him loose, I hit him four or five times; and then he sat down on the bed, and said, 'Don't hit me no more,' and threw his hands up (indicating). He was pretty bloody. When I turned around toward the table, he raised up like he was going to hit me again; and when he did, I turned around and hit him again. When I did, he caught my arm and pulled me down on the bed with him. We wrestled on the bed and fought for quite awhile. Finally he said, 'Let's don't fight any more.' He said he had enough. Then I got back up; and he said, 'Let's leave here and let's go back to town.' The girls said they were not going to ride with him; he was too drunk. The girls wet a towel and handed it to me; and I wiped the blood off my hands. I pitched it to Mr. Dorris, but he just lay back down on the bed and put his hands over his face. The girls were crying and saying. 'You have killed him.' I said, 'No, I haven't killed him. He will be all right.' We went out, and I said, 'Bill, I am going to take the girls home, and I will be back after you.' He never said anything. I walked over and told him again I was going to take these girls home, and that I would be back after him. He said, 'O. K.,' and we went out and got back in the car. That was what he said. We got in Dorris' car, and drove off. We got to 28th street and Pennsylvania avenue, and the car went dead. We went over a railroad track, and Louise bumped her face right against the dashboard. I did not hit either one of the girls. I went up to the city and got a taxi, and went back and tried to find the girls, but they had gone. I got out of the taxi in front of the Morgan Hotel, and could not see the

man I wanted to see, and walked around to the Sheaffer Beer Garden, and ordered a cup of coffee. The law came in and got me. I did not take Mr. Dorris' money."

On cross-examination the witness stated that Tommie Knight was his correct name; and the substance of his cross-examination which covers 15 pages of the record is the same as the direct examination, showing the different places where they had gone that evening before they went to the cabin; and the defendant specifically denied that he took the money. He admits he drove the prosecuting witness Dorris' car away from the cabin.

In rebuttal testimony of the state, Juanita Price was called and stated that when they went into the cabin that Mr. Dorris did not say anything insulting to her; nor did he do anything insulting.

"He did not say, 'Come on, I am going to get into your breeches.' When we got ready to leave, we girls did not say that Mr. Dorris was too drunk to drive us, and that we did not want to go with him. The defendant did not say that he would take us girls to town, and that he would come back and get Mr. Dorris."

Louise Mashburn was called in rebuttal:

"I did not hear Mr. Dorris say to Juanita Price, 'Come on, I am going to get in your breeches.' There was nothing said by Dorris before the defendant hit him. When we were leaving, the defendant did not say to us girls that he would take us to town and come back and get Dorris. We did not refuse to ride back to town with Dorris; nor did we say that Dorris was too drunk for us to ride with him. I don't know now what he said to him when we were in the cabin. I knew he was going to take us to the tourist cabin when we started out there, because that is where he said we were going."

Paul Nowlin stated that he ran the Davis Tourist Camp.

"This billfold and the driver's license registered to Tommie Knight, I first saw in the station. My wife found it in the cabin. It did not have any money in it at the time it was found. When they left the cabin in the car, I would say they were driving 40 miles an hour."

On cross-examination the witness stated it was night and dark, but the moon was shining.

At the close of the testimony, the case was argued by the attorneys, and the jury returned the following verdict (omitting the caption):

"We, the jury impaneled and sworn in the above entitled cause, do upon our oaths find the defendant guilty and fix his punishment at imprisonment in the state penitentiary for a term of 40 years. J. D. Casey, Foreman."

Motion for a new trial was filed, in which the defendant alleged 13 errors; which motion was overruled; and defendant reserved an exception.

The first assignment of error filed by the defendant is error of the trial court in overruling motion of plaintiff in error for a new trial. The motion for a new trial includes all of the other errors alleged by the defendant; and the defendant in his argument insists that the court, in giving instructions 1, 6, and 8, erred as to the law.

This court has carefully examined the instructions of the trial court; and when considered in their entirety, they correctly advised the jury as to the law applicable to the facts.

The defendant in this case is not only guilty of robbery, but is guilty of making a vicious assault on the prosecuting witness, W. P. Dorris, and beating him into insensibility, and incapacitated him for any further resistance; then stole the money of the defendant and his car, and drove away from the cabin where the robbery took

place; and as he drove away with the girls, he ran the car into a railroad track and wrecked it to such an extent that it would not run any farther. He left the girls that were with him, claiming that he would go get some conveyance to take them home, but, as shown by the record, when he got back down to where the car had been wrecked, the girls had gone.

The record in this case discloses that the prosecuting witness was a married man; that he had gone down town, and dropped into these places known by every name imaginable; but on proper investigation they are dance halls, beer joints, and places where people often congregate to make plans to entice innocent people away from homes and get them out into cabins or on the highway; and then rob them of their properties; and young girls are often persuaded out to these hell holes and seduced.

This is a flagrant case of premeditated robbery; and from the record in this case, this court is inclined to believe that the girls acquiesced, if they did not participate, in the robbing of the prosecuting witness Dorris.

One of the girls testified that when the car was wrecked, the defendant in this case wanted to know what had become of the money. She told the defendant that she did not have it, but that she would go back to the car and look; and that she started back to the car; and when she got to the car, she saw the money lying on the ground in front of the door on the driver's side of the car.

Keeping in mind that it was nighttime and the association these girls had with the defendant prior to this night, and that they had never met the prosecuting witness before, it is difficult to believe that this girl found the money on the ground.

It is more reasonable to suppose that she was carrying the money, and had carried it from the time they left the cabin where they had robbed Dorris, until the wreck; and in the effort to get out, if the money was found on the ground, she dropped it.

Her testimony is not very clear as to why she volunteered to go back and look for the money, and then accidentally found it on the ground that night.

The record shows in this case that the girls were mere children, one 14 years of age and the other 17, out at night without any parental protection or friends with them, picked up a stranger, and going from dance hall and beer joint to dance hall and beer joint, drinking whisky, and then going out to a tourist camp where cabins were rented.

The record does not show for what purpose the cabins were rented, but it indicates they were rented for immoral purposes.

The defendant had been convicted prior to this robbery and had served a term in the penitentiary.

It is not deemed necessary to extend this opinion further, except to say that considering all of the facts and circumstances in this case it is the opinion of this court that the defendant, assisted by the two girls that were with him, robbed Dorris of his money and of his car.

The defendant Knight was a habitual criminal; and while the punishment imposed by the jury in this case seems large, yet this court feels that the only way to break up the robbery of these people is to sustain the verdict of the jury, where the defendant has been given a fair and impartial trial.

Finding no errors in the record warranting this court in reversing the case, the judgment of the trial court is affirmed.

DOYLE, P. J. and BAREFOOT, J., concur.